MARK T. JANSEN (SBN 114896)
mjansen@crowell.com
MOLLY A. JONES (SBN 301419)
mjones@crowell.com
CROWELL & MORING LLP
Three Embarcadero Center, 26th Floor
San Francisco, California 94111
Telephone: 415.986.2800
Facsimile: 415.986.2827

BRUCE D. DE RENZI (*Pro Hac Vice* application to be filed)
bderenzi@bpirx.com
BRECKENRIDGE PHARMACEUTICAL, INC.
60 E. 42nd Street, Suite 2410
New York, New York 10165
Telephone: 646.448.1308
Facsimile: 646.448.1301

Attorneys for Plaintiffs
ALFASIGMA USA, INC., a Delaware Corporation,
and BRECKENRIDGE PHARMACEUTICAL, INC.,
a Florida Corporation

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| ALFASIGMA USA, INC., a Delaware Corporation, and BRECKENRIDGE PHARMACEUTICAL, INC., a Florida Corporation,<br><br>Plaintiff,<br><br>v.<br><br>NIVAGEN PHARMACEUTICALS, INC., a Delaware Corporation,<br><br>Defendant. | Case No. 2:17-cv-979<br><br>**COMPLAINT FOR FALSE ADVERTISING IN VIOLATION OF LANHAM ACT; FRAUD, UNFAIR COMPETITION AND FALSE ADVERTISING IN VIOLATION OF CAL. B.&P.C. § 17500 ET SEQ.;**<br><br>**JURY TRIAL DEMANDED** |
|---|---|

Alfasigma USA, Inc., and Breckenridge Pharmaceutical, Inc. (collectively, "Plaintiffs"), by and through their attorneys, hereby state as follows for their Complaint against Defendant Nivagen Pharmaceuticals, Inc.:

**The Parties**

1. Plaintiff Alfasigma USA, Inc. ("Alfasigma") is a Delaware corporation with its principal place of business at 4099 Highway 190 East Service Rd., Covington, Louisiana 70433.

2. Plaintiff Breckenridge Pharmaceutical, Inc. ("Breckenridge") is a Florida corporation with its principal place of business at 6111 Broken Sound Parkway, Suite 170, Boca Raton, Florida 33487.

3. Defendant Nivagen Pharmaceuticals, Inc. ("Defendant" or "Nivagen") is a Delaware Corporation with its principal place of business at 3100 Fite Circle #208, Sacramento, California 95827. The Registered Agent for Nivagen is Harvard Business Services, Inc., located at 16192 Coastal Hwy, Lewes, Delaware 19958.

Jurisdiction and Venue

4. This is an action for false advertising and unfair competition under the Lanham Act, Title 15 of the United States Code § 1125, and/or the laws pertaining to unfair competition, false advertising, and fraud in the State of California and other states in which Defendant is conducting its activities.

5. This Court has original jurisdiction over the subject matter of this lawsuit under 28 U.S.C. §§ 1331 and 15 U.S.C. § 1121(a), because it concerns violations of the Lanham Act, 15 U.S.C. § 1125.

6. This Court has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 and the doctrine of supplemental jurisdiction, because the subject matter is so related to the claims asserted under federal law as to form part of the same case or controversy.

7. The exercise of personal jurisdiction in California is proper as acts giving rise to Plaintiffs' causes of action have occurred in the State of California, and Defendant's principal place of business is in California.

8. Venue is proper in this Court under 28 U.S.C. § 1391(d).

## FACTUAL BACKGROUND

### A. Plaintiff Alfasigma and Its Medical Foods

9. Alfasigma is a fully integrated pharmaceutical company, founded over 50 years ago, that specializes in the development of medical foods that are marketed and sold nationally. Alfasigma was known as Nestlé Health Science-Pamlab, Inc. prior to its acquisition in late 2016 by Alfasigma S.p.A., an Italian pharmaceutical company. Alfasigma specializes in medical foods.

10. A "medical food" is "formulated to be consumed or administered enterally under the supervision of a physician" and "is intended for the specific dietary management of a disease or condition for which distinctive nutritional requirements, based on recognized scientific principles, are established by medical evaluation." 21 U.S.C. § 360ee(b)(3). As a therapeutic category, medical foods are similar to but distinct from both drugs and dietary supplements.

11. Although medical foods are not drugs, and the Federal Food, Drug and Cosmetic Act ("FD&C Act") does not require medical foods to be dispensed by prescription, they are intended to be used under the supervision of a physician; thus, medical foods are often dispensed via a prescription, but a prescription is not required.

12. Furthermore, according to policy of the U.S. Food and Drug Administration ("FDA"), although medical foods are not required by the FD&C Act to be dispensed by prescription, the FD&C Act does not prohibit physicians from writing prescriptions for medical foods.

13. Broadly, there are three categories of pharma products: drugs, medical foods, and dietary supplements. Dietary supplements are similar to medical foods in that they are not drugs and are not required to be dispensed via prescription. There is no FDA category for a so-called "prescription" dietary supplement.

14. Significantly, because medical foods and dietary supplements are not drugs requiring a prescription, they are not eligible for reimbursement by Medicaid or Medicare, nor are they eligible for reimbursement by many private insurers. This ineligibility for reimbursement leads to significantly lower amounts of units sold and revenues generated,

especially in comparison to drugs that are subject to reimbursement.

15. Alfasigma markets its medical foods as a "brand" pharmaceutical company. As such, Alfasigma markets its medical foods directly to physicians, educating those physicians as to the benefits and appropriate uses of those products. Alfasigma has spent millions of dollars marketing its products, calling on tens of thousands of physicians through Alfasigma's sales force, providing millions of product samples, publishing articles and advertisements in medical journals, and funding clinical studies.

16. In 1999, Alfasigma, through its predecessor Pamlab LLC, began production of a medical food relevant to this lawsuit, i.e., Foltx®. Foltx® was formulated to meet the distinct nutritional requirements of persons with certain diseases and medical conditions that may benefit from administration of vitamins $B_6$, $B_{12}$, and folic acid[1]. For example, persons with elevated homocysteine levels are recognized as having an independent risk factor for arteriosclerosis and coronary heart diseases, which have been linked with venous thromboses and strokes. Studies have shown that a combination of vitamins $B_6$, $B_{12}$, and folic acid can lower a person's homocysteine levels. Foltx® was developed and formulated to meet this need for such persons.

17. In 2007, Plaintiff Breckenridge entered into an agreement with Alfasigma's predecessor to market and sell Folbic™ (the "Breckenridge Licensed Generic Product"), which is the only licensed generic of Foltx®.

**B. Plaintiff Breckenridge's Licensed Generic Product**

18. Breckenridge is a generic pharmaceutical company. For more than 25 years Breckenridge has been in the business of developing and marketing generic pharmaceutical products. Breckenridge currently markets more than 70 such products.

19. The Breckenridge Licensed Generic Product, Folbic™, has the same ingredients, in the same strengths, as Foltx®.

**C. Generic Substitution**

20. A pharmacist presented with a doctor's prescription for a brand product may fill

[1] All references herein to Foltx® are to this folic acid-containing brand product.

that prescription by dispensing the product prescribed, or alternatively, may dispense a generic version of the product. This latter process is known as "generic substitution."

21. For the types of products at issue in this action, a generic product is the same or equivalent to a brand product in dosage form, safety, strength, route of administration, quality, performance characteristics and intended use.

22. Pursuant to industry practice, before generic substitution can occur, and thus before a generic product can be marketed to pharmacies, the generic product must first be "linked" to the brand product in databases employed by the pharmaceutical industry, such as First DataBank and Wolters Kluwer (Medi-Span). Retail pharmacies, chains, and other purchasers of such products rely on this "linking" in the databases to establish that two different products are substitutable. This "linking," along with any other similar representations of equivalency made by a generic company to its customers and to pharmacy purchasers at the national wholesale and retail levels, conveys that the generic product is substitutable for the respective listed brand or other equivalent generics, and can be stocked for its own stores or customers. As a result, pharmacists at the local level will understand that the generic product can be dispensed as a substitute for the listed products.

23. Unlike drug products, whose equivalency ratings are determined by FDA and referenced in the FDA's "Orange Book" publication, equivalency determinations for medical foods are essentially based on an "honor system." The industry databases simply rely on the information provided by the generic pharmaceutical companies, including the truth and accuracy of the generic product's label claims. This process is not wholly dissimilar to that performed by the FDA, in that FDA does not actually conduct testing of generic drug products but simply reviews the information submitted by the generic pharmaceutical companies. Thus, with respect to medical foods and drug products, the industry databases and FDA, respectively, simply conduct paper reviews that differ in scope and magnitude.

24. Thus, if a generic company represents to the industry databases that its generic medical food contains the same active ingredients in the same amounts as the brand medical food product or other equivalent generic, the databases will "link" that generic to the brand or

equivalent generic product -- without regard to the actual content of the active ingredients in that generic product -- because the databases do not independently determine whether the product content is in fact the same as that claimed on the product label. The listing databases do *not* perform any independent testing on products, nor are they provided with product samples or testing data. As such, this system depends on truthful and accurate reporting by the generic companies as to the identity and amount of each active ingredient in their products.

25. In reliance upon a representation from a generic company that its product contains the same active ingredients in the same amounts as a listed brand or equivalent generic product, the industry databases will then, in turn, represent to the pharmaceutical industry that the generic product is pharmaceutically equivalent to the listed products. The generic company will as a result have represented to the customer base shared by all generics (namely pharmaceutical chains, distributors and wholesalers) that its generic product is equivalent to and substitutable for the brand or other equivalent generic product, and may be dispensed to fill prescriptions for either.

26. Where there is more than one generic alternative, there is direct competition among the generic products that have been linked to the same listed brand product, as pharmaceutical chains (and other such customers) often select a preferred generic to dispense in place of the brand product, where such substitution is permitted, desired, or even required. This direct competition between generic equivalents can continue after a brand product has been discontinued or reformulated, as prescriptions continue to be written for the original brand product, for which these generic products can continue to be dispensed. For some products, this competition among generics can last for years after the original brand product is no longer on the market or has been reformulated. Once products are linked and substitutable, the main differentiator in the marketplace is related to product pricing, but can also be affected by other attributes or aspects of those products.

**D. Defendant Nivagen's Knock-Off Product**

27. Defendant Nivagen is a California-based, generic drug distributor that according to the company's website "is engaged in the development, acquisition and sales of generic

prescription drugs and over the counter products for the North American market." (http://www.nivagen.com/). On information and belief, Nivagen, does not directly market its pharmaceutical products to physicians. Rather, similar to Breckenridge, it advertises and promotes its products to pharmaceutical wholesalers, distributors, pharmacies, pharmacists and national drug databases as "generics" or substitutes for brand or other equivalent generic pharmaceutical products. Its sales result from "generic substitution" of its products for brand or other equivalent generic pharmaceutical products.

28. On information and belief, Nivagen promotes, markets, sells and distributes its products nationwide, including in the State of California and in this judicial district.

29. On information and belief, in March 2015, Nivagen began marketing the product Niva-Fol™ as a generic of Foltx® and the Breckenridge Licensed Generic Product, Folbic™. Nivagen labeled this product as containing the same active ingredients in the same strengths as Foltx® and Folbic™.

30. On information and belief, in its commercial advertising and promotion to drug databases, wholesalers, pharmacies, pharmacists and others in the pharmaceutical distribution chain, Nivagen expressly represents and/or necessarily implies that its Niva-Fol product is the same as Foltx® and/or Folbic™.

31. On information and belief, in its commercial advertising and promotion to wholesalers, pharmacies, pharmacists and others in the pharmaceutical distribution chain, Nivagen markets Niva-Fol as a generic equivalent and substitute for Foltx® and/or Folbic™, differentiating Niva-Fol from Foltx® and/or Folbic™ on the basis of pricing parameters (including status as a prescription product reimbursable by government agencies). In furtherance of its marketing scheme, Nivagen has caused its Niva-Fol product to be "linked" to Foltx® and/or Folbic™ in the industry databases that are used by pharmacists to select the product to be dispensed when filling a prescription, and has caused its Niva-Fol product to be described as a prescription product that requires an Rx symbol on its label, for among other reasons, reimbursement applications. Moreover, on information and belief, Nivagen has intentionally had its Niva-Fol product listed on the official source for FDA drug label information, DailyMed,

where Niva-Fol is referred to as having a National Drug Code ("NDC") and/or National Health Related Items Code ("NHRIC") number.

32. On information and belief, Nivagen seeks to capture market share by encouraging generic substitution of its Niva-Fol product for prescriptions written by health care providers for Foltx® and/or Folbic™.

33. On information and belief, Nivagen's efforts have had their intended effect; based upon Nivagen's commercial advertising and promotion, industry databases have linked Niva-Fol as a generic equivalent to Plaintiffs' Foltx® and/or Folbic™ products, thereby representing to wholesalers, pharmacies, pharmacists and others that Niva-Fol is substitutable for Foltx® and/or Folbic™.

34. On information and belief, as a result of Nivagen's commercial advertising and promotion, wholesalers and pharmacies in the Eastern District of California and across the country have ceased or will cease to purchase Folbic™ based on the linking of Nivagen's Niva-Fol product as a generic equivalent and substitute for Foltx® and/or Folbic™. This could not occur unless Nivagen stated and/or conveyed to industry databases, wholesalers, pharmacies, pharmacists, and others in the distribution chain that Defendant's Niva-Fol product is substitutable for Foltx® and/or Folbic™.

**E. Nivagen's Unlawful Conduct**

35. On information and belief, Nivagen's Niva-Fol product is not properly substitutable for Foltx® and/or Folbic™, and Nivagen has intentionally mislabeled its Niva-Fol to improperly gain commercial advantages. For example, on its label and in its package insert, Nivagen represents that its Niva-Fol product is "Made in USA", as well as other false and/or misleading statements or omissions, and that it is a "prescription" dietary supplement accompanied by an "Rx" symbol, and actively caused to have its Niva-Fol product improperly listed on DailyMed as having an NDC and/or NHRIC number associated with its product.

36. Upon information and belief, Niva-Fol is inaccurately and improperly designated as "Made in USA" when it is not, thus conferring an unfair competitive advantage to Nivagen and its Niva-Fol product.

37. Furthermore, Nivagen has engaged in systematic and deliberate actions to gain further unfair competitive advantages. For example, Nivagen has improperly described the qualities and characteristics of its Niva-Fol product on its drug label. DailyMed, hosted by the National Library of Medicine, is the official provider drug label information supplied to FDA. The drug label information on DailyMed is the most recent information submitted to FDA and currently in use.

38. According to DailyMed:

> DailyMed provides trustworthy information about marketed drugs. DailyMed is the official provider of FDA label information (package inserts). This Web site provides a standard, comprehensive, up-to-date, look-up and download resource of medication content and labeling found in medication package inserts.

(http://dailymed.nlm.nih.gov/dailymed/about-dailymed.cfm).

A printout of the DailyMed entry for Niva-Fol (https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=acd020d4-8dcf-403d-a8b4-06fb6e67d8b5) is attached as Exhibit A. Two relevant excerpts, with highlighting, of the labeling information for Niva-Fol from DailyMed show that, according to information provided by or on behalf of Nivagen to the National Library of Medicine and/or FDA, Niva-Fol has an NDC and/or NHRIC number:




**LABEL: NIVA-FOL- pyridoxine hydrochloride, folic acid and cyanocobalamin tablet**

VIEW PACKAGE PHOTOS



NDC Code(s): 75834-080-90

**Packager:** Nivagen Pharmaceuticals, Inc.

INGREDIENTS AND APPEARANCE

**NIVA-FOL**
pyridoxine, folic acid, and cyanocobalamin tablet

| PRODUCT INFORMATION | | | |
|---|---|---|---|
| Product Type | DIETARY SUPPLEMENT | Item Code (Source) | NHRIC:75834-080 |
| Route of Administration | ORAL | DEA Schedule | |

39. The Drug Listing Act of 1972 requires registered drug establishments to provide FDA with a current list of all drugs manufactured, prepared, propagated, compounded, or processed by it for commercial distribution. Drug products are identified and reported using a unique, three-segment number, called the National Drug Code ("NDC"), which serves as a universal product identifier for drugs. The National Health Related Items Code ("NHRIC") also provides a system for identification and numbering of medical device packages that is compatible with other numbering systems such as the NDC.

40. According to FDA, assignment of an NDC number to a non-drug product is "extremely prohibited." Assignment of an NDC number to a non-drug product can lead to improper state and/or federal government reimbursement (for example, by Medicaid) for a non-drug product. Under certain governmental programs (*e.g.*, Medicaid) the states and/or the federal government provide some insurance coverage for prescription outpatient drugs and medical devices. Notably, medical foods are treated differently than drugs, and medical foods are often not subject to reimbursement by state and/or federal government.

41. On information and belief, with knowledge that NDCs were no longer issued by FDA to non-drug products, Nivagen purposefully submitted, or authorized others to submit on its behalf, information causing Niva-Fol to be listed on DailyMed such that Niva-Fol would be shown as having an NHRIC number. Since before Nivagen began marketing its Niva-Fol product in or about 2015, FDA had stopped issuing NHRIC numbers unless specifically requested to be used during a phase-out period. Nivagen's use of an NHRIC number for its Niva-Fol product – a number properly used only for medical devices suitable for government

reimbursement – was in furtherance of its scheme to convey that its Niva-Fol product is reimbursable under those same government agencies. By wrongfully conveying that its product had an NDC and/or NHRIC number, Nivagen knowingly and wrongfully obtained a competitive advantage of appearing to being eligible for reimbursement by government agencies, including Medicaid.

42. On information and belief, Nivagen purposefully submitted, or authorized others to submit on its behalf, information to FDA that caused Niva-Fol to be listed on DailyMed such that Niva-Fol is listed as a "prescription" dietary supplement that "requires an Rx on the label," and that Niva-Fol requires "an Rx status and a National Drug Code (NDC)" or similar product code as required by "reimbursement applications."

43. Niva-Fol is not a drug and it is "extremely prohibited" for it to have an NDC number; representation of Niva-Fol as a drug and/or as properly being identifiable by an NDC and/or NHRIC number is false and misleading and upon information and belief must have been obtained by malicious, wanton and/or fraudulent conduct.

44. As a result of Defendant's false and misleading statements, Plaintiffs have lost and/or will lose sales and market share of their Foltx® and Folbic™ products, have been and/or will be forced to reduce their own sale prices for those products, and have suffered and/or will suffer other economic losses as a result of the foregoing.

**COUNT I**

**FALSE ADVERTISING IN VIOLATION OF**

**THE LANHAM ACT, 15 U.S.C. § 1125(a)**

45. Plaintiffs incorporate the allegations of the preceding paragraphs as though fully set forth herein.

46. On information and belief, Nivagen advertises and promotes its Niva-Fol product to drug databases, wholesalers, pharmacies, pharmacists, and others in interstate commerce as a prescription product and bearing a prescription "Rx" symbol and as having or being associated with an NDC and/or NHRIC number listed on DailyMed, thereby representing that its Niva-Fol product is a prescription drug product or medical device. On information and belief, Nivagen

represents to the industry based on the coding of its Niva-Fol product that it is a prescription drug product and/or medical device that is eligible for reimbursement by agencies of the states and/or federal government. Also on information and belief, Niva-Fol is inaccurately and improperly designated as "Made in USA" when it is not.

47. Nivagen's advertising and promotional claims about its Niva-Fol product's prescription status and associated NDC and/or NHRIC numbers, and statement of origin, are literally false and misleading and/or false by necessary implication. Niva-Fol is not a drug, is not a prescription drug product, is not a medical device, and is not eligible for reimbursement under federal government agencies. Nivagen's false and misleading advertising and promotional claims violate the Lanham Act, 15 U.S.C §1125(a)(1)(B).

48. On information and belief, Nivagen has also made other false and/or misleading representations concerning the nature, characteristics, qualities, or geographic origin of its Niva-Fol product, including designating that Niva-Fol is "Made in USA".

49. Pursuant to 15 U.S.C. § 1117, Plaintiffs are entitled to damages for Nivagen's Lanham Act violations, an accounting of profits made by Nivagen on sales of its Niva-Fol product, as well as recovery of the costs of this action.

50. Nivagen's acts are willful, wanton and calculated to deceive, and are undertaken in bad faith, making this an exceptional case entitling Plaintiffs to recover additional damages and reasonable attorneys' fees pursuant to 15 U.S.C. § 1117.

51. Unless enjoined by this Court, Nivagen's acts will irreparably injure Plaintiffs' goodwill and cause erosion of their market share and other economic loss. Pursuant to 15 U.S.C. § 1116, Plaintiffs are entitled to preliminary and permanent injunctive relief to prevent Nivagen's continuing unlawful acts.

52. Upon information and belief, Nivagen will continue its violation of the Lanham Act unless restrained and enjoined by this Court. Due to Nivagen's continuing acts of false advertising, Plaintiffs have suffered and/or will suffer irreparable injury for which they have no adequate remedy at law.

**COUNT II**

**FRAUD**

53. Plaintiffs incorporate the allegations of the preceding paragraphs as though fully set forth herein.

54. On information and belief, Nivagen actively submitted, or authorized others to submit on its behalf, information causing Niva-Fol to be listed as having an NDC and/or NHRIC number, resulting in information concerning Niva-Fol being made available on DailyMed; Defendant Nivagen intentionally and fraudulently sought to have its Niva-Fol product unfairly and improperly associated with an NDC and/or NHRIC number, with the goal to gain an unfair competitive advantage of having its product appear to be reimbursable by agencies of the states and/or federal government as a prescription drug product or medical device. In furtherance of this fraudulent scheme, Defendant Nivagen also improperly labelled its product as a "prescription" product along with the prescription "Rx" symbol. In addition, Niva-Fol is inaccurately and improperly designated as "Made in USA" when it is not. All of these acts were done to gain an unfair competitive advantage over other listed products, including Plaintiffs' Foltx® and Folbic™.

55. Nivagen's acts are willful, wanton and calculated to deceive, and are undertaken in bad faith, making this an exceptional case entitling Plaintiffs to recover additional damages and reasonable attorneys' fees pursuant to 15 U.S.C. § 1117.

56. Unless enjoined by this Court, Nivagen's acts will irreparably injure Plaintiffs' goodwill and cause erosion of their market share and other economic loss. Pursuant to 15 U.S.C. § 1116, Plaintiffs are entitled to preliminary and permanent injunctive relief to prevent Nivagen's continuing unlawful acts.

57. Upon information and belief, Nivagen will continue its violation of the Lanham Act, 15 U.S.C. § 1125, unless restrained and enjoined by this Court. Due to Nivagen's fraudulent acts, Plaintiffs have suffered and/or will suffer irreparable injury for which they have no adequate remedy at law

**COUNT III**

**UNFAIR COMPETITION (CAL. BUS. & PROF. CODE § 17200, *et seq.*)**

58. Plaintiffs incorporate the allegations of the preceding paragraphs as though fully set forth herein.

59. Nivagen's acts constitute unfair and unlawful methods of competition, unfair or fraudulent business acts or practices, and unfair, deceptive, untrue or misleading advertising, in violation of California Business and Professions Code § 17200, *et seq*.

60. The acts of Nivagen, as set forth herein, have resulted in Nivagen directly and/or indirectly competing unfairly with Plaintiffs with regard to Foltx® and/or Folbic™, and as a direct and proximate result of Nivagen's unfair competition, Plaintiffs have been injured and have suffered economic loss.

61. By the aforesaid acts, Nivagen has irreparably injured Plaintiffs, and such injury will continue unless enjoined by this Court.

**COUNT IV**

**FALSE ADVERTISING (CAL. BUS. & PROF. CODE § 17500, *et seq.*)**

62. Plaintiffs incorporate the allegations of the preceding paragraphs as though fully set forth herein.

63. Nivagen's acts constitute false advertising within the meaning of California Business and Professions Code Section 17500, *et seq*.

64. The false advertising of Nivagen, as set forth herein, was designed and calculated by Nivagen to directly or indirectly mislead the pharmaceutical industry to believe that Defendant's Niva-Fol product is a prescription drug product and/or medical device entitled to federal reimbursement by state and/or federal government agencies as a drug product and that Niva-Fol is "Made in USA".

65. Plaintiffs have been injured and have suffered economic loss as a direct result of Nivagen' false advertising.

66. Plaintiffs have no adequate remedy at law and Nivagen's unlawful conduct will continue to damage Plaintiffs unless immediately enjoined by this Court.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray for the following relief:

A. The Court enter a judgment and an order temporarily, preliminarily and permanently enjoining Defendant, its agents, servants, employees, attorneys, successors and assigns, and all others in active concert or participation with Defendant, from literally or impliedly falsely or misleadingly advertising or promoting its Niva-Fol product or inducing others to substitute its Niva-Fol product for prescriptions written for Foltx® and/or Folbic™;

B. The Court enter a judgment and an order pursuant to 15 U.S.C. § 1116(a), temporarily, preliminarily and permanently enjoining Defendant, its agents, servants, employees, attorneys, successors and assigns, and all others in active concert or participation with Defendant, from making or inducing others to make any false, misleading or deceptive statement of fact, or representation of fact in connection with the promotion, advertisement, display, sale, offering for sale, manufacture, production, circulation or distribution of its Niva-Fol product in any manner that states, implies or suggests that its Niva-Fol product is an "Rx" or prescription drug product that is eligible for reimbursement by state and/or federal government agencies as a drug product or medical device;

C. The Court enter a judgment and order pursuant to 15 U.S.C. § 1116(a), directing Defendant to file with the Court and serve on Plaintiffs within thirty (30) days after the service of the injunction on Defendant, or such extended period as the Court may direct, a report in writing under oath setting forth in detail the manner and form in which Defendant has complied with the injunction and/or that its Niva-Tel product is "Made in USA";

D. The Court enter a judgment and an order requiring Defendant to take immediate action to correct any confusion, mistake or deception it has caused in the pharmaceutical industry and/or public concerning the nature, characteristics, qualities or origin of its Niva-Fol product, including without limitation placement of corrective advertising;

E. The Court enter a judgment and an order granting Plaintiffs such other relief as the Court may deem appropriate to prevent Nivagen from causing any further confusion, mistake or deception in the pharmaceutical industry and/or public concerning the nature, characteristics,

qualities or origin of its Niva-Fol product, including but not limited to in comparison to Foltx® and/or Folbic™;

F. The Court enter a judgment and an order requiring Defendant to pay Plaintiffs' damages in the amount of Plaintiffs' actual and consequential damages resulting from Defendant's false and misleading advertisements and marketing and unfair competition pursuant to 15 U.S.C. § 1117(a), and the laws of the State of California including California Business and Professions Code Sections 17200 *et seq*. and 17500, *et seq*., any and all profits resulting from Defendant's advertisements and marketing of its Niva-Fol product, and the costs of this action;

G. The Court enter a judgment and an order finding that this is an exceptional case and requiring Defendant to pay Plaintiffs additional damages equal to three times the actual damages awarded Plaintiffs pursuant to 15 U.S.C. § 1117(a);

H. The Court enter a judgment and an order finding that Defendant acted maliciously, wantonly and/or fraudulently, requiring Defendant to pay Plaintiffs punitive damages;

I. The Court enter an order finding that this case is an exceptional case and requiring Defendant to pay all of Plaintiffs' reasonable attorneys' fees, costs and expenses, including those available under 15 U.S.C. § 1117(a), and any other applicable law;

J. The Court enter a judgment and an order requiring Defendant to pay Plaintiffs pre-judgment and post-judgment interest on the damages awarded; and

K. The Court enter a judgment and an order awarding Plaintiffs such other and further relief as the Court deems just and equitable.

DATED: September 22, 2017 CROWELL & MORING LLP

By: */s/ Mark T. Jansen*
Mark T. Jansen

Attorneys for Plaintiffs
ALFASIGMA USA, INC., a Delaware Corporation, and BRECKENRIDGE PHARMACEUTICAL, INC., a Florida Corporation

**JURY DEMAND**

Plaintiffs demand a trial by jury of all issues so triable.

DATED: September 22, 2017

CROWELL & MORING LLP

By: */s/ Mark T. Jansen*
Mark T. Jansen

Attorneys for Plaintiffs
ALFASIGMA USA, INC., a Delaware Corporation, and BRECKENRIDGE PHARMACEUTICAL, INC., a Florida Corporation